OPINION OF THE COURT
C. Raymond Radigan, J.
This is a proceeding for a determination of the validity and effect of a surviving spouse’s notice of election pursuant to EPTL 5-1.1-A. A trial was heard before the court on December 20, 1999. At trial, counsel for the estate and for the surviving spouse, as well as the guardian ad litem appointed for infant beneficiaries, agreed that this was a Greiff case, i.e., one in which the validity of an antenuptial agreement is in issue in light of the recent Court of Appeals decision in Matter of Greiff (92 NY2d 341).
As this court has recently held, Greiff (supra) “stands for the proposition that the spouse who contests an antenuptial agreement has a threshold burden of proving by a fair preponderance of the credible evidence a fact-based particularized inequality between the parties that demonstrates probable undue influence and unfair advantage. If this initial burden is sustained, then the burden of going forward shifts to the proponent of the antenuptial agreement to prove that the agreement was free from fraud, deception or undue influence” (Matter of Buzen, NYLJ, Apr. 2, 1999, at 35, cols 1, 3).
At trial only three witnesses were called: Alen Beerman, an attorney who reviewed the antenuptial agreement with the surviving spouse; Lenard Marlow, the attorney who drafted the agreement; and Marguerite Rappaport, the surviving spouse. From the credible testimony of these three witnesses the following facts emerge.
Marguerite Downs met Fred Rappaport in the spring of 1983. At that time she was 23 and he was 49. They met in New York City at the home of a mutual friend. Shortly after their first meeting Marguerite returned to her home in Houston. However, their relationship quickly took off and Fred financed Marguerite’s weekend trips to New York so they could be together. Shortly thereafter, Marguerite moved in with Fred in his home in Mill Neck in Nassau County in April of 1983 and lived with him there continuously until Fred’s death on December 31, 1998, except for a period of separation from September 1988 to February 1989. They married on June 23, 1990; it was her second marriage, his fourth. She had worked in a supermarket and a clothing store. Prior to meeting Fred, Marguerite had *662 gone to college for several semesters but never graduated with a degree. While in college she studied marketing, business law and other business-related courses. Although originally from Michigan, she had lived in Canada during her first marriage and, when that ended, she moved to Houston, Texas, where she became employed as a secretary. After about a year in Houston she moved to New Orleans where she sold food products for General Mills. After six months in New Orleans Marguerite went back to Houston where she was employed leasing commercial real estate, which she was doing when she first met Fred. For most of the 15 years that Fred and Marguerite were together she did not work, his income and assets being sufficient to provide a very comfortable lifestyle for both of them. Marguerite was employed during their previously mentioned separation. During that period she sold time shares in St. Martin and worked for the Beleor Corporation in New Jersey. Significantly, this separation ensued after Marguerite gave Fred an ultimatum that either he marry her or she was leaving. His response to that ultimatum is apparent from the fact of her departure.
As this court held in Buzen (supra, at 35, col 3):
“The challenger to the agreement still bears the initial burden of proving a fact-based particularized inequality between the parties that manifests probable undue influence and unfair advantage. Some of the relevant factors in this regard are as follows:
“ — detrimental reliance on the part of the poorer spouse * * *
“ — relative financial positions of the parties * * *
“ — the formality of the execution ceremony itself * * *
“ — full disclosure of assets as a prerequisite to a knowing waiver * * *
“ — the physical or mental condition of the objecting spouse at the time of execution * * *
“ — superior knowledge/ability and overmastering influence on the part of the proponent of the agreement * * *
“ — the presence of separate, independent counsel for each party * * *
“ — the circumstances in which the agreement was proposed and whether it is fair and reasonable on its face * * *
“ — provision for the poorer spouse in the will.”
The court will now consider these factors seriatim as they apply to this case.
*663 Detrimental reliance on the part of the poorer spouse. It does not appear to the court that Marguerite gave up friends, family, assets, or career objectives to marry Fred. It is true that she had no family in New York but there was no evidence that she had any family in Houston or New Orleans where she was living before she met Fred. By her own admission she had no assets to speak of and there was no evidence of a career trajectory that was knocked off course as a result of the marriage. In fact, it is difficult to see how Marguerite could even convincingly argue these things because even if she had given them up, it wotild have been merely to cohabit with Fred, since they lived together for seven years before their marriage.
Relative financial positions of the parties. Clearly, there was a very large difference in Fred and Marguerite’s financial conditions. At the time of the execution of the antenuptial agreement in June of 1990 Fred’s assets were in the millions of dollars while Marguerite’s $200,000 included a chose in action of $185,000.
The formality of the execution ceremony. This will be discussed below in the discussion of the presence of separate counsel.
The physical or mental condition of the objecting spouse at the time of execution. There is no credible evidence that Marguerite was suffering from any physical or mental condition that would affect her ability to understand the agreement or to make her more susceptible of undue influence or coercion.
Superior knowledge/ability and overmastering influence on the part of the proponent of the agreement. While it may be that Fred was a better businessperson than Marguerite, there is no evidence of his wielding an overmastering influence on her. Her earlier ultimatum and decision to leave him evince her ability to think and act independently of Fred.
The presence of separate, independent counsel for each party. Much of the testimony at trial was concerned with this issue. Lenard Marlow, the attorney who drafted the antenuptial agreement, had been a friend or acquaintance of Fred’s from high school but they had not had any social or business contacts since then. Fred was referred to Mr. Marlow by the rabbi who was to perform the wedding ceremony. The original draft of the agreement, prepared pursuant to Fred’s instructions, provided for Marguerite’s, waiver of all property in the event of either divorce or death. It contained no monetary provision for her whatsoever. It also had a blank where the name of Marguerite’s attorney was to be filled in. A second draft, prepared *664 shortly thereafter, contained the same provisions except that it provided that Fred would leave Marguerite $65,000 in his will and identified Marguerite’s attorney as an Alen Beerman, although the name was misspelled in the instrument. One of Mr. Beerman’s subtenants in the office space he leased was an attorney named Kenneth Lowenthal who was evidently a friend of Fred’s. Lowenthal asked Beerman to review the antenuptial agreement for Marguerite, which he did. Although Beerman denies ever representing Marguerite, he concedes that he reviewed the document in advance of his meeting with her, that he made handwritten alterations/additions to the instrument, and that he spent about an hour in his office with her, discussing the agreement in detail. The most significant of the changes suggested by Beerman are in the final document which Marguerite signed. Among them is a provision that in the event the will does not provide for the $65,000 bequest, then Marguerite has the right to elect against the will to that extent. Although not suggested by Beerman, the promised bequest in the final agreement is $100,000, not $65,000.
Exactly what happened after Marguerite’s meeting with Beerman is unclear. Marlow says he got a call from a person who identified himself as Beerman, representing Marguerite, suggesting changes to the antenuptial agreement. Beerman denies ever speaking to Marlow. Marguerite contends that it was Lowenthal, Fred’s friend, who called Marlow pretending to be Beerman. How this deception would benefit Fred is not convincingly explained but it is of little import. The attorney who reviewed the document on Marguerite’s behalf, Beerman, was clearly disinterested. He made important substantive suggestions as to how the document could be improved from Marguerite’s perspective and those suggestions are in the final document.
Marguerite testified that after her meeting with Beerman she ripped up the document and told Fred, who was not present in Beerman’s office but was down the hall to Lowenthal, to drive her home. She then claims that she and Fred drove around for three hours while he implored her to sign the document telling her it was only temporary. Finally, she relented, and they went to Marlow’s office to sign the final document. This clearly self-serving testimony was not credible. Marlow described Marguerite in his office as being upbeat and excited, hardly the kind of disposition one would expect from a woman who was allegedly badgered for three hours to execute a document she didn’t want to sign. If Marguerite really believed the *665 document was to be temporary, she fails to explain why, over the course of the next eight and a half years, she made no attempts to have it modified or revoked.
The circumstances in which the agreement was proposed and whether it is fair and reasonable on its face. Marguerite claims that the first time Fred mentioned an antenuptial agreement was within two weeks of their wedding but her own diary contains entries, which she was unable to explain, several weeks before that regarding a meeting with a matrimonial lawyer and discussions regarding an “agreement.” Even if Marguerite never met with counsel at that time, it is strong evidence that the antenuptial agreement was brought up weeks prior to the date when Marguerite testified it came up.
Provision for the poorer spouse in the will. Fred’s will provided more for Marguerite than did the antenuptial agreement because the $100,000 bequest under the will did not require any reduction for sums passing to Marguerite outside the will whereas the antenuptial agreement provided that the $100,000 would be commensurately reduced by anything passing outside the will.
Based on the foregoing, the court concludes that Marguerite has failed to sustain her threshold burden of proving such an inequality of circumstances between the parties to demonstrate provable undue influence and unfair advantage. That being so, the burden never shifted to the estate to prove the absence of fraud, deception, or undue influence. Accordingly, the court determines that her notice of election is of no force or effect.
The court has also reviewed the affirmation of services submitted by the guardian ad litem and after giving careful consideration thereto, fixes the fee of the guardian ad litem in the sum of $22,000 plus allowable disbursements of $536.81.